The SOLID ROCK FOUNDATION, Richard Bills and Daniel Holstein, Plaintiffs,

v.

The OHIO STATE UNIVERSITY, acting through the Office of Grounds, Roads & Streets Maintenance, Dean Ramsey, Supervisor for the Office of Grounds, Roads & Streets Maintenance, the Ohio State University, acting through the Office of Business Administration, and Weldon Ihrig, Assistant Vice President of the Office of Business, Administration, Defendants.

No. C-2-78-1246.

United States District Court, S. D. Ohio, E. D.

March 14, 1979.

---

Karlton J. Rothgeb, Columbus, Ohio, for plaintiffs.

G. Ross Bridgman, Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

DUNCAN, District Judge.

This is a civil action for declaratory and injunctive relief and for damages. Plaintiff, Solid Rock Foundation (hereafter "Solid Rock"), is a student organization at The Ohio State University that distributes *Today's Student,* a national student newspaper presenting Christian ideas. Plaintiffs Richard Bello and Daniel Holstein are students of The Ohio State University and members of Solid Rock.

Defendants are the Ohio State University (hereafter "OSU") and Dean Ramsey, Supervisor for the Office of Grounds, Roads, and Street Maintenance, OSU, and Weldon Ihrig, Assistant Vice President of the Office of Business and Administration, OSU. Defendants Ramsey and Ihrig are being sued in their official capacity and as individuals.

The Court has jurisdiction under 28 U.S.C. §§ 1343 and 2201 and 42 U.S.C. § 1983. Plaintiffs claim defendants have, by their conduct and by regulation, deprived the plaintiffs of free speech, press and religion in violation of the First and Fourteenth Amendments to the United States Constitution and of equal protection in violation of the Fourteenth Amendment to the United States Constitution.

A hearing was held to determine whether a preliminary injunction should issue.

### Factual Background

On the basis of the pleadings and evidence adduced at the hearing, the Court finds the following facts:

1. Beginning in Autumn 1977 and since that time, plaintiffs have distributed *Today's Student* on the OSU campus.

2. Distribution for the 1977–78 school year at OSU was approximately 7,000 newspapers each week out of 10,000 placed on campus.

3. Defendants first became aware of the distribution of *Today's Student* by means of complaints received by the University Ombudsman from students and staff.

4. In Spring 1978, defendant Ramsey and his staff picked up and discarded issues of *Today's Student* found on the outdoors grounds of the campus.

5. In Spring 1978, employees of OSU established unpublished regulations restricting distribution of off-campus publications, including *Today's Student,* to locations in 8 of the approximately 100 campus buildings and prohibited the placement of any newspapers outdoors on campus grounds.

The defendants claim that they have acted to regulate the distribution of plaintiffs'

publication so that the campus will be "aesthetically pleasurable," "a serene atmosphere conducive to the study and sober reflection" can be maintained, free movement of students and faculty on campus will not be impeded, and educational objectives may be pursued in an orderly manner.

6. Pursuant to those regulations plaintiffs were informed that they would be entitled to distribute *Today's Student* at the eight designated locations inside campus administration and classroom buildings and in the dormitories and cafeterias on the OSU campus after first advising and obtaining permission from individual dormitory directors.

7. On or about November 27, 1978, employees of OSU authorized plaintiffs to distribute *Today's Student* in vending racks at eight outdoor locations. These additional eight locations are not being used by the plaintiffs because they duplicated permissible inside locations or are otherwise not desirable.

8. During Autumn Quarter 1978, weekly distribution of *Today's Student* fell by approximately 2,000 newspapers. Approximately 5,000 of the 10,000 available were picked up each week.

9. *Today's Student* is distributed once weekly. It is dropped off at 7:00 a. m. and is picked up at approximately 5:00 p. m. that evening or on the following morning. Plaintiffs have assured defendants that stacks of papers will be monitored and will be placed in racks meeting defendants' approval.

10. The official OSU student newspaper, *The Lantern*, is distributed at 145 points around campus.

11. Significant portions of the OSU campus community cannot be reached by Solid Rock because of the distribution limitations effected by the regulations. For instance, the Colleges of Medicine, Law and Dentistry are not included as places where plaintiffs may distribute their papers.

12. An OSU representative testified that the distribution points allocated were chosen to maximize exposure to student traffic patterns over a several day period. Since *Today's Student* is left on campus for only a period of 24 hours or less weekly, the allocation is inadequate to reach many OSU students.

13. Other non-university sponsored newspapers are distributed on campus: *The Choking Times, Columbus Dispatch* and *Columbus Citizen-Journal*. These publications are also subject to the new distribution regulations.

14. The regulations have not yet been reduced to a formal published rule of the OSU trustees.

15. Defendants Ihrig and Ramsey were acting under color of law of the State of Ohio as employees of OSU, which is supported by funds from the Treasury of the State of Ohio, in their actions concerning the regulation of the distribution of *Today's Student.*

### Contentions of the Parties

Plaintiffs' challenge to the University's regulations is two-fold. First, they contend the restriction on distribution of *Today's Student* violates the First Amendment because it infringes on the plaintiffs' freedom of speech and press. While plaintiffs acknowledge that reasonable time, manner and place regulation may be imposed on the distribution of newspapers, plaintiffs maintain that the challenged regulations are overly broad and unconstitutionally restrictive in that they prevent plaintiffs from distributing in 90 percent of defendants' buildings or on outside locations of plaintiffs' choice. OSU defends the regulations as reasonable, because they further substantial interests and insubstantially burden plaintiffs' rights.

Second, plaintiffs contend that they are deprived of equal protection of the laws as guaranteed by the Fourteenth Amendment because the University's in-house publications, most notably the student newspaper, *The Lantern*, enjoy unrestricted distribution. Defendants counter that plaintiffs are only entitled to be treated equally with those similarly situated, and that the educa-

tional, laboratory nature of the student newspaper justifies its unique treatment. They further argue that distribution of *The Lantern* does not throw open a public forum to which all may have access.

Finally, defendants contend that the requested relief would violate the establishment clause of the First Amendment's religious freedom component, because it would excessively entangle OSU in plaintiffs' religious organization.

### Discussion of Law

■ It should be noted at the outset that at this stage of the action the case is not before the Court on the merits but rather on the question whether plaintiffs have satisfactorily demonstrated that preliminary injunctive relief is warranted. Therefore the inquiry at this stage is limited to whether the plaintiffs have shown (1) a strong or substantial likelihood or probability of success on the merits; (2) irreparable injury; (3) that the issuance of a preliminary injunction would not cause substantial harm to others; and (4) that the public interest would be served by issuing a preliminary injunction. *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).

No single factor is necessarily dispositive; proper judgment entails a balancing of all elements involved.

### 1. *Likelihood of success on the Merits*

Unquestionably the plaintiffs' publication is expression protected by the First Amendment. The dissemination of ideas through newspapers is a classical mode of free speech exercise. Defendants have not argued that anything in the nature of plaintiffs' message places their publication beyond First Amendment protection.

■ Our starting point therefore is the fundamental principle that any significant encroachment upon a First Amendment liberty can only be justified by a subordinating interest that is compelling. *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*,

357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

■ On the present record, it appears likely that plaintiffs' First Amendment rights are being abridged. The Amendment's protection extends to the circulation and distribution of the newspaper. *Ex Parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877 (1878). "This freedom embraces the right to distribute literature, *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 and necessarily protects the right to receive it." *Martin v. Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (1943). The plaintiffs are not suffering an absolute deprivation of free expression, but as is discussed below, the regulation effectively cuts plaintiffs off from reaching certain significant segments of the student population and reduces the number of persons who may be reached by plaintiffs' expression. While not wreaking a total denial, the regulations nonetheless appear to abridge plaintiffs' constitutional rights in a substantial way.

This raises the question, then, whether the abridgment is justified by a subordinating interest that is compelling.

■ Affording to one publication rights denied others is strong evidence that the distinction is suspect because based upon the content of the message conveyed. Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Police Department of Chicago v. Mosely*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Defendants contend that the distinction is not drawn along lines of substantive content. First, they point out that all newspapers—other than the university-published *Lantern*—are subject to the same limitations as is *Today's Student*. Thus the particular views espoused in plaintiffs' publication are not singled out for disparate treatment. The problem, however, is the ad hoc manner in which the regulation was formulated and adopted. Before *Today's Student* appeared on campus, there was apparently no established practice or written policy

limiting distribution. The application of the regulation—developed in response to plaintiffs' newspaper—across the board to all non-university publications, does not entirely obviate an inference that the lines drawn were directed at content. However, in ruling on this motion, the Court need not make a conclusion on that issue.

Next the Court must address the equal protection challenge. The Supreme Court has framed the pertinent principle of law as follows:

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities.

*Mosely, supra*, at 96, 92 S.Ct. at 2290.

■ Defendants argue that the regulations do not deny plaintiffs equal protection since plaintiffs receive treatment equal to that of all others similarly situated, *i. e.*, other off-campus newspapers. Nevertheless, the student newspaper, *The Lantern*, is granted preferred distribution rights. The Court is convinced that *The Lantern*, partially financially subsidized by University funds, has a clinical instruction function and in that respect is quite dissimilar to *Today's Student*. Furthermore, *The Lantern* carries certain official University information of a general advisory nature, and is also in that respect quite different from plaintiff's publication. *The Lantern* also prints information that most daily papers carry such as: editorials, current news, advertisements and news of a religious nature. The Court fully understands the differences and similarities between the two publications, and today it need not decide whether dissimilar treatment through carefully drawn regulations is constitutionally appropriate. What is important regarding *The Lantern* is that the University newspaper as presently distributed has opened a public forum on the campus. Therefore, whether or not *The Lantern* may be lawfully awarded preferred rights of distribution, plaintiffs' publication must also be afforded a reasonable distribution so that it cannot be said that their right to access to the public forum has been unreasonably denied. In sum, in this regard plaintiffs have shown a likelihood of success in sufficiently showing their entitlement to reasonably equal, if not identical, treatment as given *The Lantern*.

■ Assuming for the purposes of this motion that the defendants' actions were not prompted by the content of plaintiffs' newspaper, the Court must balance the interests of the parties. Thus, defendants' regulations which effectively diminish the distribution points available to plaintiffs must be weighed on balance with their articulated purposes for formulating the regulations. Reasonable regulations of the time, place and manner of expression and of conduct unrelated to expression may be imposed.

> The First and Fourteenth Amendments have never been treated as absolutes. Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life.

*Breard v. Alexandria*, 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951). To declare the test as one of "reasonableness" does not permit the Court to abandon its duty to ascertain whether competing interests are compelling. The Supreme Court has stated that the First Amendment permits only those time, manner and place regulations that are "necessary to further significant governmental interests." *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). A regulation is unreasonable when its incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of an important or substantial state interest. *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Reasonableness is to be determined by "The nature of a place, 'the pattern of its normal activities . . . .' " *Grayned, supra,* 408 U.S. at 116, 92 S.Ct. at 2303. "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id.* Viewing the present regulations against this standard, I conclude that the likelihood of plaintiffs prevailing on this issue is substantial.

■ The Supreme Court has considered the special interests of the educational environment in connection with First Amendment rights. See *Grayned, supra; Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints. The principle that " 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' . . . is not confined to the supervised and ordained discussion which takes place in the classroom." *Tinker, supra,* at 512, 89 S.Ct. at 739. Plaintiffs' distribution of *Today's Student* is not the kind of activity which "materially disrupts classwork or involves a substantial disorder or invasion of the rights of others" such as the noisy picketing in *Grayned* or the classroom demonstrations in *Sword v. Fox,* 446 F.2d 1091 (4th Cir. 1971). The argument that limitations on expression may be imposed for the purpose of diminishing litter has been rejected. *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Distribution of newspapers is not inconsistent with the goals of maintenance of law and order and the pursuit of educational objectives in an orderly manner set forth in R.C. 3345.21. Nor does it conflict with a serene atmosphere conducive to the study and sober reflection necessary in the process of higher education. Less restrictive alternatives are available to the parties to maintain free movement of students and faculty and to prevent transforming the University into a "gigantic newsstand."

## 2. *Irreparable Harm*

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 627 (1976). After defendants imposed their restrictions on distribution of plaintiffs' newspaper, plaintiffs' distribution decreased from 7,000 to 5,000. This fact alone establishes at least prima facie proof that plaintiffs' readership dropped and that therefore the First Amendment rights both of plaintiffs to convey their ideas and of their readers to receive them, have been significantly diminished in consequence of defendants' actions.

As noted above, plaintiffs have not suffered a total loss of their distribution rights. But its restriction appears to have amounted to a substantial abridgment. In view of the Court's holding that plaintiffs have demonstrated a substantial likelihood of success on the merits, the conclusion is inescapable that the plaintiffs have been and will continue suffering irreparable injury if a preliminary injunction does not issue.

## 3. *Harm to Others*

■ The Court is of the opinion that the issuance of a preliminary injunction in this case will not cause substantial harm to others. As noted, the University has not yet formally adopted its new regulations. The defendants have not established that limiting plaintiffs' distribution is necessary in order to avert substantial harm to others. Plaintiffs have expressed willingness to cooperate with University policy against litter by monitoring their distribution points and by picking up papers remaining at the end of the day.

There may be complaints from those in the campus community who desire not to be subjected to plaintiffs' views, such as appear to have prompted the University action in the first place. But the University may not, in the interest of protecting particular persons from an unpopular view-

point, substitute its judgment for the judgment of the individual, who has a right to determine whether or not he is willing to receive plaintiffs' message. *Martin, supra,* 319 U.S. at 143–44, 63 S.Ct. 862.

### 4. *The Public Interest*

 As was stated in the *Martin* case: Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner distribution, it must be fully preserved.

*Id.* at 146–47, 63 S.Ct. at 865. It is in the interest of all members of society to enjoin apparently unreasonable restraints on freedom of expression; only then can each of us be assured that when he has something to say, the forum will be open.

### Conclusion

 This decision on plaintiffs' motion for preliminary injunction is not the last word concerning these issues. At a hearing on the merits the entire case will be litigated.

Nothing in this decision is intended to prevent the University from implementing carefully drawn regulations which allow plaintiffs' fair and reasonable access to all significant points of distribution to all substantial areas of the campus population and which will protect the rights of students and faculty to move freely on campus.

The Court's decision is in regard to the claims of these plaintiffs and no other persons or publications.

The Court does conclude, however, that the regulations plaintiffs complain of herein, are likely not to pass constitutional muster. Therefore, pending final resolution of the important issues at stake in this case, equity demands that plaintiffs' distribution of *Today's Student* should not be restricted as called for by these regulations.

In granting the preliminary injunction, the Court relies upon plaintiffs' repeated assurances that they will not abuse their distribution rights and will employ reasonable measures to minimize litter on campus caused by the distribution.